**PHILLIPS et al. v. KIGHT et al.**

No. 19218. Opinion Filed Sept. 10, 1929.

Robson & Moreland and Phillips & Huggins, for plaintiffs in error.

D. M. Battenfield and H. Tom Kight, for defendant in error.

BENNETT, C. This was an action in district court of Rogers county brought by H. Tom Kight against E. A. Inman and Warren B. Phillips, guardian, etc. Later, a cross-petition was filed by Louis Phillips, Oren Phillips and Kate Phillips, minors, by their guardian ad litem, H. D. Moreland. Said Kight will be referred to herein as plaintiff and the other parties as defendants.

Plaintiff sought to foreclose a pledge on a Nash automobile, the property of E. A. Inman. The petition is in usual form alleging the pledge and delivery of possession of said machine by owner, and that Warren B. Phillips, as guardian, claims an interest therein as mortgagee; that mortgagee's lien, if any, is inferior to that of plaintiff. The guardian's answer consisted of: First, a general denial; and, second, a denial that the machine was pledged to plaintiff, but, if so, he took it with knowledge of the mortgage thereon. The minors' cross-petition alleged that, on July 21, 1926, E. A. Inman executed to said guardian his promissory note for $1,346.68, and secured same by chattel mortgage on the car in suit; that the conditions of the mortgage are broken, and that they are entitled to possession of the car, but that plaintiff, who is in possession thereof, has refused to deliver same upon demand; that the market value of the car is $2,000 and the refusal to deliver the car has damaged cross-petitioners $200.

Inman failed to appear and judgment as prayed for went against him. The issues are between plaintiff on the one hand and the guardian and his wards on the other. The minors were made parties and later replevied the car from plaintiff, who gave a redelivery bond.

A jury was waived and all pending issues were tried by the court, who adjudged plaintiff entitled to a lien against the car for $1,000, an attorney fee of $100 for foreclosure of pledge, and that defendant guardian recover upon his notes and mortgage, subject only to plaintiff's said lien for $1,100, and that plaintiff have a third lien for $500, from which judgment defendants W. B. Phillips, guardian, and H. D. Moreland, guardian ad litem for the minors, appeal.

It is admitted that at the time plaintiff

took possession of the car, defendant's mortgage was not of record. Defendants assert, however: First, that the car was never pledged to plaintiff; second, that he had actual knowledge of the mortgage; and, third, that he parted with no value. It is also admitted that the rulings of court on the testimony were fair.

Defendants' first specification is that the court erred in refusing to quash service of summons upon the minor defendants. The infants were not only parties to this suit, but sought foreclosure of their mortgage, thereby invoking the jurisdiction and power of the court, which precludes the urging of this specification of error. Clem Oil Co. v. Oliver, 106 Okla. 22, 232 Pac. 942; Key v. State ex rel. Hodge, Co. Atty., 101 Okla. 211, 224 Pac. 549; In re Widener's Estate, 112 Okla. 54, 240 Pac. 608.

A glance at the other specifications indicates that the sole vital questions presented by defendants are: Was the evidence of plaintiff sufficient to constitute a pledge of this property to him by Inman? If so, for what amount? Did plaintiff have knowledge of defendants' mortgage when the car was delivered to him, or did he have knowledge of such facts as would charge him with such knowledge? These questions will require a consideration of the evidence.

The substance of plaintiff's testimony is as follows: Plaintiff, as witness: Is a practicing attorney; lives at Claremore; became acquainted with E. A. Inman July 25, 1926, when called to county jail. Inman and another had just been arrested for burglarizing city market in Claremore. Inman requested witness to defend him and his partner; witness talked with Inman as to proof against them. Inman indicated he was interested mainly in making bond and getting out of prison as early as possible because he was wanted at other places; was afraid they would claim him in Texas and Kansas. Witness asked him about a fee and he replied that his wife could raise the money; that she was at a hotel at Radium Springs near Salina; wanted witness to telephone her; that she would raise money for attorney fee and asked witness how much it would be. Witness replied that it was near election time, that witness was a candidate, and that since the offense was committed in his home town, he was not anxious to represent them unless paid a good fee; that for the preliminary, the effort to make bond, and the defense in district court, the charge would be $1,000. Inman said his wife would raise the money and to telephone her.

That the chief of police and the jailer had a little money taken off them at the time of arrest, and that he had a new automobile in hands of the chief; that it was free and clear; that it was paid for; that he was afraid they would confiscate it for crimes they had committed, and asked witness to get the car and turn it over either to his wife or to attorney McGhee at Miami. He gave witness an order on chief of police and the jailer for the money and an order for the car. Witness said to him in the presence of the jailer, "If that car is not clear and if that car is tangled up in any manner, I don't want anything to do with it," and he said in the presence of Mr. Chiles many times that the car was absolutely free and clear, that there was not a dime against it, that it was paid for. So witness went to chief of police, secured the car and telephoned Inman's wife, who came next morning, but registering under another name. She said that she had come for the car. Witness told her that Inman told him that she would pay a fee of $1,000, and that she could have the car if that sum were paid; she said she did not have the money, but could raise it and went away; came back that night; said she could not raise it and asked witness to call attorney McGhee at Miami. This witness did and McGhee and another came to office of witness on Tuesday, the 27th (McGhee had been representing him or codefendant in some other matters) and wished the car turned over. Witness said:

"There is this condition; it is a $1,000 attorney's fee to me; I quit the case or I keep the car; now you fellows can just figure it as you want to on this."

They left witness' office and went to the jail and talked to Inman. After this witness told Inman what had happened and the conversation with McGhee and he said his wife would raise the money soon and for me to retain the car to secure payment of $1,000, and if that sum were not paid that I would then have the car. Witness talked to him half dozen times during the day in presence of jailor and was assured that the car was clear and nothing was against it. Witness then attempted to make bond for him; did make bond for the man with him. Witness drove to Spavinaw one night to find court clerk and got his bond approved; made half dozen or more abortive attempts to make bond for Inman; represented both parties at preliminary hearing, filed habeas corpus writ in Criminal Court of Appeals; made two trips to Oklahoma City on that; up to that time witness never had heard of a mortgage. Mr. Phillips gave witness the first information on that. He came to Claremore with a bond and witness attempted to get it approved for Inman; while Mr. Phillips

was there he said that Inman had made a mortgage on his car to him as guardian and witness said, "Well, I have done this work, and I am not going to turn loose this car unless I am paid." Phillips and witness then prepared a petition in Criminal Court of Appeals and witness took same to such court for hearing on this petition for writ. This was an effort to force clerk to approve bond which Mr. Phillips had filed. The court refused because property listed was not clear.

Later Texas made requisition on Oklahoma for Inman. Inman asked witness to go to Oklahoma City and fight the requisition. Witness said to him, "My services that I have already contracted with you are worth a great deal more than the amount of money you agreed to pay me; if I go into this matter, it will be $500 additional," and he said, "That is satisfactory, you go into it, and, if it is worth that much more, why, you retain the property until you get it." Went to Oklahoma City and defeated requisition; made perhaps two trips on that matter. Later authorities of Carter county demanded and received Inman from officers of Rogers county. Witness secured release of Barker on bond. Barker's case was set down for hearing and witness appeared for him.

"Q. Mr. Kight, did you ascertain as to whether or not there were any mortgages or liens filed against the property involved in this cause in this county? * * * A. Yes; there was none for some time after I had possession of the car. * * * Q. And you learned that fact from the records? * * * A. Yes, I learned from the records there was nothing filed against it in this county at the time I got it and for some time thereafter."

Plaintiff took possession of the car ten days before the mortgage was filed in Bryan and 26 days before it was filed in Rogers county.

Cross-examination: Witness had never seen Inman before. F. G. Ward, alias Fred Barker, was charged with Inman. The arrangement was not for $500 apiece as attorney fee, but was for $1,000; they were prosecuted jointly. Witness had later an agreement for additional $500 for looking after requisition matters which came up. Witness had constant conversations with Inman, sometimes 12 or 15 a day. Witness and Inman talked over fee on Sunday, the 25th, but it was on Tuesday when he pledged the car, but witness had possession of the car since preceding Sunday. Witness was to represent both defendants in preliminary and in district court and try to secure bonds for them. The preliminary was August 5th.

No certificate of title was ever delivered to witness and he never saw or heard of it. No certificate was in car when he got it; does not know whether or not sheriff got certificate out of car. Began defense of men at once after employment. Preliminary was concluded in one day. Witness was very busy in efforts to make the bonds. The contract was not to make but to try to get bonds approved, and in this effort witness examined several abstracts. Inman and Barker were arraigned August 8th. Witness represented them, also had hearing in Criminal Court of Appeals on application for writ about a week after arrest. Inman was charged also in county court with possession of burglary tools, where witness represented him and secured his bond. Witness and Mr. Phillips were in close touch when the matter was before the Criminal Court of Appeals. Phillips had represented Inman before in Bryan and Carter counties.

John Chiles, witness for plaintiff: Jailer for 2½ years Rogers county; called Mr. Kight to the jail for Inman; heard conversations there almost continuously. Heard Inman say car was clear of incumbrance. He said that when he gave order on chief of police for the car. Inman kept plaintiff on the road all the time that he could, continually calling for him.

Cross-examination: Mr. Kight asked Inman quite a bit about car; he said it was free and clear and this occurred almost every day. Plaintiff was not employed at witness' suggestion; did not suggest to Inman, or Barker, whom to employ.

Mr. McGhee, witness for plaintiff; practicing lawyer at Miami; knew Inman; helped defend Inman at Claremore; the charge was burglary. Went to Claremore soon after the arrest and had conversation with Inman, at which time he asked witness to recover and turn over car to his wife. Witness then went to offices of plaintiff, who told him Inman had turned car over to secure fee. He told plaintiff he thought the car was bought on payments in August and that plaintiff replied he had phoned the company and recorder's office and that it was not mortgaged; said to plaintiff that he thought one Phillips had furnished money to pay off mortgage but plaintiff said that some one may have paid off the mortgage for him, but the car was clear as they had not taken a mortgage back. Plaintiff told witness he was not anxious to defend these men; that he would be subject to severe criticism and would not do so unless a fee were secured; witness then went

back to Inman at the jail and repeated that conversation. Witness advised Inman to allow plaintiff to keep car to secure fee of $1,000, whereupon Inman asked witness to tell his wife to go home and allow car to be held until $1,000 fee was paid. For this fee plaintiff was to represent both defendants in preliminary hearing and in district court. Knew nothing of Texas requisition. Habeas corpus in Criminal Court of Appeals was not contemplated. Thinks car was not mentioned in first conversation with Kight, but witness went back to jail and Inman said that fee had not been agreed upon and wished witness to get agreement on it. Went to plaintiff and suggested that Inman wanted an agreement on fee and plaintiff said it would be $1,000. Witness told Inman amount of plaintiff's fee, then Inman told witness about Mr. Phillips having furnished money to pay off mortgage on car, but said let plaintiff hold car. After Inman told him about Phillips, he did not advise plaintiff what Inman told him.

A. V. Robinson, court clerk, of Rogers County; Mr. Phillips was connected continuously with plaintiff in this work and knew the work that was going on. Plaintiff was attempting to secure approval of bonds. Plaintiff spent a good deal of time during July in this enterprise.

H. Tom Kight, recalled: He received from Inman between $100 and $200 in cash. This was about enough for his expenses to Oklahoma City several times where he went in their behalf. In original agreement no expense was contemplated. Received order for this money soon after the arrest, but it was about a month before he got the money.

Plaintiff rests and defendant demurs to the evidence which was overruled.

Deposition of Q. P. McGhee; same party who testified for plaintiff. Learned of arrest of Inman within three hours. Plaintiff and witness represented Inman. Had conversation soon after Inman's arrest with Mr. Kight in regard to car; does not recall date, but it was on witness' first trip to Claremore. Plaintiff informed witness the car was in hands of chief of police and witness said he understood same was mortgaged. Plaintiff said he called the company who sold the car and found that mortgage had been paid. Witness told plaintiff that he understood other parties had furnished money to take up the mortgage on car and had taken mortgage. Knows nothing about why Inman turned car over to plaintiff.

Freddie Barker, by deposition: Age 23, Tulsa, Okla.; knows Inman and plaintiff; witness and Inman were put in jail at Claremore July 25th. Inman gave plaintiff order for car, to get it from the officers. Inman told plaintiff there was mortgage against car for over $1,300 for purchase money held by W. B. Phillips. Some inmate of jail suggested that plaintiff be employed. Plaintiff agreed to defend case for Inman for $500. Witness made no arrangement with him. July 25th, Inman paid plaintiff $75 on attorney's fee, and witness wrote out an order on the sheriff for $85, to be paid plaintiff. This was loan to Inman.

Warren B. Phillips, age 36, residence Wewoka. Guardian for Louis Phillips, Oren Phillips and Kate Phillips, children of witness. Produces check for $1,221 drawn on Commercial National Bank of Durant, signed by Warren B. Phillips, guardian, payable to Nash-Bechel Motor Company. Witness was buying paper that Inman owed on Nash car. The check represents the money. These people had mortgage on car for $1,221.

"Q. At whose instance did you give that draft to them? Do you know Elmer Inman? A. Inman, yes, sir. Q. At whose instance did you give that draft? At whose request? A. Well, practically his (Elmer Inman's)."

And to secure it witness took a note and mortgage. The note is for $1,348.68. The note has not been paid. Witness had first conversation with plaintiff as to mortgage August 17, 1926. Witness told him he had mortgage on it and the amount. Witness has not known Elmer Inman long. Knew father of Inman before the latter got in jail at Durant, altogether, perhaps, two or three years. Witness told plaintiff he had come to help him make bond and when witness told him he had a mortgage on car, said, "That is the first I ever heard of there being any mortgage on that car." Plaintiff said, "I was under the impression that the car was clear." Plaintiff did not claim that the car was pledged. At that time witness understood that preliminary had been held. Barker was out on bond at that time.

"Q. What was your mission here (Claremore)? A. Well, it was two or three things. I wanted to find out about this car, but my principal mission right at that time was to try to make an appearance bond for Inman."

Asked why he did not file his mortgage, the witness says that he did not get back to Durant for two days, and then he does not know why he did not file it, just neglected it, but finally filed it on August 4th.

Cross-examination: Witness came to Claremore principally at the instigation of Inman's father. Inman had never lived at Durant much.

"Q. Well, I told you that it was turned over to me as being free and clear of any incumbrance, and that I was holding that car for my fee and that it wasn't going to be turned over until that fee was paid? Didn't I? A. Well, along that line you told me substantially that. You told me that the chief of police of Ponca City had been here and told you that one of these—told one of these officers here that the mortgage—I think this fellow's name was Tuck—something like that—I didn't understand whether he told you—told you that he was here to look these boys over and that he went into the sheriff's office and called up from there back to Ponca City to the people that had sold the car, and they said the car was clear. I think that is about right. Q. Now, you didn't make any demand for the car at that time, did you? * * * A. No, not that day. Q. You were then demanding nothing but getting a bond approved for Inman, weren't you? A. No. Q. Well, you were insisting that we ought to have a bond approved? A. I told you that I was willing to help him if his father would indemnify me. Q. If his father would indemnify you? A. Yes, the old man—I thought he was all right. He had made me safe on other bonds I had made for him at Durant. Q. You had made bonds for this fellow before? A. Well, I made a bond for him at Durant. Q. Charged with burglary? A. Yes, he was charged with burglary there. Q. How many cases against him? * * * A. There were two charges of burglary against him at Durant, and they made the two bonds of $2,000 each. Q. Now, didn't you make bond for him over in Carter county? A. No, I didn't make that bond. There was one made, but Mr. H. H. Brown was attorney in that case. Q. You went over there? A. No, that was before I got acquainted with him. He had made those bonds. Q. You didn't know him, then, when he got into that trouble at Ardmore? A. I didn't know Elmer, no. Q. And he left Ardmore after he got into that trouble, and then came into Durant, and since then is the only time that you have known him? A. Well, I got acquainted with him when he was in jail at Durant. I just knew the old man—I had never had any dealings before with his father up to that time. I wanted to correct that. Q. The only acquaintance you had had with this fellow was having him in jail at Durant, and the cases were still pending against him, weren't they? A. I don't know. * * * Q. And you, then, knew that he was charged with burglary in each one of them? A. Yes, that's right. Q. And you knew he had been charged with burglary up at Ardmore? A. Yes, sir. That was before he was arrested at Durant. * * * Q. And with that knowledge, then you put that much money into a car for him, and didn't file your mortgage? A. That's right. * * * Q. You furnished the two sureties for the bond in the county court here, didn't you? A. Well, I made the deal in this way: my sister made the bond, but I recommended it to her, and she was to charge them for making the bond. I never was paid for making the bond. Q. I had it approved, didn't I? A. Yes."

H. Tom Kight, recalled: Q. P. McGhee only suggested in his conversation that he had not been informed that this car was not paid for and that it was bought on payments there at Ponca City. Witness never asked Phillips if he had a mortgage. Had never heard of such a thing. When he came into witness' office, witness told him that he had the car and Phillips said, "I have a mortgage on the car." We were then fixing to go into the matter of requisition, and I said, "If there was going to be any tangle about this thing, I am not going over there and fool with that." He (Phillips) said that he was not going to make any demand on it and I went on and did the work.

From all this evidence the court made certain findings of fact to the effect that plaintiff exercised reasonable diligence to ascertain whether or not the car was incumbered; that he in good faith entered into a contract with Inman to receive and hold the car as pledge for the payment of $1,000 fee; that this arrangement was made between the 25th and 30th of July; that Inman was a notorious criminal and his case required much time and attention; that $1,000 was not an unreasonable fee in the premises, and that $750 would be a reasonable value for the services performed by plaintiff to August 17th; that $100 would be a reasonable attorney fee for foreclosing the pledge. The court finds that probably information that Phillips had a claim against the car was given to plaintiff, but not until August 17th, and thereupon the court rendered judgment as hereinbefore indicated.

We have read the entire record, including the evidence, and have gone over carefully several times the vital parts of the evidence, and we cannot conclude that the finding of the trial court is either without support or is against the clear weight of the evidence. This record presents a clean-cut issue of fact. If the plaintiff is to be believed, he has been diligent, circumspect and without fault in the premises. He appears to have given energetic attention to a client who was in dire need of the best legal attention obtainable. The legal attention furnished seems to have been adequate, intelligent and persistent. On the other hand, if the evidence on the part of defendants is to be believed, the plaintiff took the car either with full knowledge of the mortgage to the guardian, or with a knowledge of facts sufficient to impute to or charge him with such

knowledge as would preclude the idea that he was a purchaser for value and without notice. The undenied facts themselves alone furnish some corroboration to the conclusion at which we have arrived. It would seem rather unreasonable for a candidate for public office to enter actively into the defense of one who had committed a burglary in his home town without some adequate arrangement for a substantial fee. It cannot be said, we think, that plaintiff accepted such employment without such promise. It is true that no pledge was made on July 25th, but at that time plaintiff had the possession of the car and the assurance that Inman's wife could and would raise the $1,000, and when that was found to be incorrect, according to plaintiff's evidence, the pledge was immediately made.

It is true that the evidence of Inman and Barker is contrary. The weight to be given the testimony of such witnesses is a problem. There is also the evidence of McGhee. This evidence lacks something of being direct, and from it one might conclude that he did not give plaintiff all the information which he could have given and at the earliest time possible. He does not seem quite definite as to the time of certain conversations with respect to other incidents. Again we have to consider the testimony of Phillips. This reflects a conversation had with plaintiff August 17th, at which time, under the findings, the plaintiff had already done most of the work. But even then Phillips did not demand the mortgaged car from the plaintiff for the benefit of his wards, but chose to aid and assist the plaintiff all he could in an effort to release Inman from jail by furnishing bonds executed by Phillips' sister and others whom he could influence to make bond, but having failed to liberate Inman, he, by letter, demands of plaintiff the car.

The outcome of this lawsuit inevitably results in a loss to some one. Defendants claim that the plaintiff advanced nothing and therefore should have no claim in a court of equity. We cannot subscribe to this contention. A lawyer's capital stock is his knowledge, his ability; his energy, his influence and his intelligent attention given to those things demanding more than ordinary thought. Sometimes these attentions, however earnest, diligent and skilful, avail nothing; but often they mean the difference between life and death, liberty and imprisonment, success and failure, and gain and loss in business. When one needs a lawyer, usually his needs are immediate and often imperative, if not vital. It is true he does not furnish money, or lands, or stocks; but often the security of these depend upon the skill and knowledge and integrity of the lawyer.

It is true also that courts have a soft spot towards the protection of minors, and their protection is not to be lost sight of, but their guardians can misuse, trifle with, and endanger their funds, despite the courts. In the case at bar, as appears from the evidence, the guardian selected, as the object of his preference in the loan of trust funds, a man who, to his knowledge, had been charged with two burglaries at Ardmore, the same number of burglaries a short time later at Durant, and whom he had known principally in jail. He chose as his security a chattel mortgage on an automobile which everyone knows can lose its value entirely as security through a moment's carelessness, or can be run out of the country between suns. And withal left his mortgage off the record sufficiently long to permit the mortgagor to indulge his well-known penchant for burglarious enterprises in a distant town.

But even these repeated offenses did not seem to feaze the mortgagee, who seemed bent upon the enterprise of liberating him. The connection seems obscure and hazy. If the guardian had consulted the moral hazard of his loan, it would seem that he trifled open-eyed with danger. Courts cannot prevent the natural result of such lack of ordinary prudence.

We are not basing our opinion on the guardian's apparent lack of wisdom or his negligence, but we are adverting to it only as indicating a situation which is a little hard to understand, and in the perusal of the testimony it outcrops.

For the reasons given, we hold that the judgment of the trial court should be affirmed.

JEFFREY, DIFFENDAFFER, HERR, and TEEHEE, Commissioners, concur.

By the Court: It is so ordered.